UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
═══════════════════════════════════════════════════════

MARIANNE BAUER

          Plaintiff,

v.                                  3:10-cv-01152  NPM

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,

          Defendant.
-----------------------------------------------------------------------------------------------

APPEARANCES:                  OF COUNSEL:

Hinman, Howard and Kattell, LLP     Laurie M. Ceprano, Esq.
Attorney for Plaintiff
P.O.Box 5250
80 Exchange Street
Binghamton, NY 13902-5250

Social Security Administration        Tomasina DiGrigoli, Esq.
Attorney for Defendant
Office of Regional General Counsel
Region II
26 Federal Plaza - Room 3904
New York, NY 10278

NEAL P. McCURN, Senior District Court Judge

## MEMORANDUM - DECISION AND ORDER

      This action was filed by plaintiff Marianne Bauer ("plaintiff") pursuant to

42 U.S.C. § 405(g) to review the final determination of the Commissioner

("Commissioner") of the Social Security Administration ("SSA"), who denied her

application for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI").  Currently before the court is plaintiff's motion for judgment on the pleadings (Doc. No. 9) seeking reversal of the Commissioner's decision with a finding of disability, or in the alternative, an order of remand for a new hearing. Also before the court is the Commissioner's motion for judgment on the pleadings (Doc. No. 12) seeking affirmation of the Commissioner's findings.  For the reasons set forth below, the Commissioner's motion is granted, and plaintiff's motion is denied.

## I.      Procedural History and Facts

### A.      Procedural history

On February 4, 2005, plaintiff filed a Title II application for a period of disability and disability insurance benefits ("DIB"), and a Title XVI application for Supplemental Security Income benefits ("SSI").  In her applications, plaintiff alleged disability beginning on May 18, 2004.  A hearing was held on September 27, 2006, and plaintiff's claims were denied by Administrative Law Judge ("ALJ") Robert E. Gale in a decision issued on December 18, 2006.  Plaintiff requested review by the Appeals Council, and on April 4, 2007, the Appeals Council vacated the December 18, 2006 decision and remanded plaintiff's claims to the same ALJ for further proceedings (which were to include testimony from a vocation expert),

to be held on June 24, 2009.

The June 24 hearing was adjourned for the attainment of consultive examinations, and was rescheduled for August 12, 2009.  Plaintiff did not appear for the August 12 hearing, but appeared and testified at a hearing held on September 10, 2009 in Binghamton, New York.   A vocational expert ("VE") also appeared and testified at that hearing.  The ALJ issued an unfavorable decision on September 17, 2009, finding that plaintiff was not disabled from the period of May 18, 2004 through the date of that decision.  The decision of the ALJ became final when the Appeals Council denied plaintiff's request for review on July 30, 2010. This action followed.

> B.    Facts

The following facts are taken from plaintiff's statement of the case and are supplemented as the court deems necessary.  A plaintiff's facts submitted in disability appeals are often incorporated by the Commissioner in his brief, with the exception of any inferences or conclusions asserted by plaintiff.  Here, the Commissioner objects to plaintiff's recitation of facts, alleging that plaintiff's memorandum of facts is incomplete and contains argument.  Accordingly, the Commissioner submits additional facts.  The court omits plaintiff's arguments from her statement of facts, makes corrections where she mischaracterizes

testimony, and includes such facts submitted by the Commissioner that the court deems relevant.

Plaintiff's date of birth is January 22, 1963.  She was 41 years old on the alleged disability onset date.  Plaintiff has a high school diploma, and vocational training as a hair stylist and nail technician. Tr. 362.  Plaintiff has past relevant work as a salon hair stylist, from November of 1995 until May of 2004. Tr. 32; 362.  Plaintiff has not engaged in any substantial gainful activity since May 18, 2004. Tr.24.  She alleges disability arising out of multiple physical and psychological impairments.  With respect to her physical impairments, plaintiff has undergone multiple diagnostic tests for her spinal conditions.  An MRI of the cervical spine was performed on June 2, 2004.  Tr. 215-16.  That MRI of the cervical spine revealed cervical lordosis. Tr. 216.  There is a C5-6 posterior endplate remodeling seen with broad based disc bulge and central disc herniation, causing mild spinal canal stenosis without compromise of the neural foramen at this level. Tr. 216.  At C6-7, there was a broad based disc bulge. Tr. 216. For her spinal conditions, plaintiff initially began treatment with her family practitioner, Dr. Michelle Boyle ("Dr. Boyle"). Tr. 202.  Dr. Boyle's treatment of plaintiff continued to the time this action was filed.  Dr. Boyle provided a medical assessment of the ability to do work related activities on November 7, 2007. Tr.

233-36.  Dr. Boyle's initial notes reflect tendonitis in the right upper extremity with a flare-up of symptoms and neck pain. Tr. 203-05.  Plaintiff previously had shoulder surgery performed by Dr. Brosnan in 2003. Tr. 205.  Plaintiff alleges that she woke up on May 30, 2004 with shooting pain in her upper arm.  Plaintiff states that she was having difficulty performing work as a hair dresser at that point and was in fact removed from work. Tr. 205.  In early June of 2004, plaintiff was referred to Dr. Saeed Bajwa ("Dr. Bajwa"). Tr. 206.  The MRI of the cervical spine, referenced above, revealed disc herniations, spinal stenosis and disc bulges as noted supra. Tr. 206.  Dr. Bajwa first treated plaintiff on August 6, 2004. Tr. 217.  At her initial visit, Dr. Bajwa diagnosed plaintiff with severe neck pain, with radicular right arm pain more than the left arm at extension, most likely secondary to cervical spondylosis and degenerative disc disease at C5-6 and C6-7. Tr. 219. A regimen of treatment was recommended including physical therapy with ultrasonics, hydrocollators and neck exercises three times a week for three weeks. Tr. 219.  Medications were prescribed, including Bextra. Tr. 219. Dr. Bajwa also noted that plaintiff "may have a touch of carpal tunnel syndrome because of her profession of hair stylist." Tr. 219.  Dr. Bajwa recommended EMG nerve conduction studies if the symptoms did not improve. Tr. 219.

Dr. Boyle initially completed a residual functional capacity ("RFC")

5

assessment on November 7, 2005. Tr. 233. In that assessment, Dr. Boyle found

that plaintiff could lift and carry no more than ten pounds overall and could carry

zero pounds occasionally and frequently.  Dr. Boyle wrote that with respect to

standing, walking and sitting, plaintiff would need to change positions at will, and

can only occasionally climb, balance, stoop, crouch, kneel and crawl.  She was

very limited in her ability to reach, handle, as well as push and pull, due to the

numbness and tingling in the upper extremities.  Dr. Boyle noted plaintiff has a

tendency to drop items as a result. Tr. 233-36.  Plaintiff was also to avoid

temperature extremes. Tr. 236.  On a correspondence signed on September 26,

2006, Dr. Boyle confirmed that her assessment of November 7, 2005 was still

valid within a reasonable degree of medical certainty. Tr. 268-69.

      Plaintiff has continued to treat with Dr. Boyle.  Dr. Boyle provided an

update RFC physical assessment on May 5, 2007. Tr. 296.  In that assessment, she

found that plaintiff could lift and carry less than ten pounds overall and zero

pounds occasionally or frequently; needed frequent position changes for standing,

walking and sitting; could only occasionally climb, balance, stoop, crouch, kneel

and crawl; was affected in her ability to reach and handle and was to avoid

temperature extremes. Tr. 293-96.  Dr. Boyle again updated her physical RFC

assessment on July 30, 2008. Tr. 318.  Dr. Boyle noted at that point that there were

no changes since she last saw plaintiff in April of 2008. Tr. 315.  Dr. Boyle was

asked to complete a mental RFC. Tr. 312.  Dr. Boyle again indicated that she was

not aware of any changes since she last saw plaintiff in April of 2008 as reflected

in her office notes. Tr. 312.

Based on a consultative neurological examination on August 24, 2009 (Tr.

322-34), Dr. Justine Magurno found that plaintiff was five feet three inches tall

and weighed 187 pounds.  Her blood pressure was 125/62 mm/Hg.  Her

uncorrected vision was 20/25 in the right eye, 20/40 in the left eye, and 20/20 in

both eyes.  Plaintiff's gait was left antalgic.  She could walk on her heels and toes

without difficulty.  She could not stand on her right toes.  She did not use any

assistive device.  She was unable to tandem walk.  The Romberg test was negative.

She needed no help changing at the examination or getting on and off the

examination table. She was able to rise from a chair with mild difficulty. Tr. 324.

The mental status examination revealed that plaintiff was dressed appropriately.

Tr. 325.  She maintained appropriate eye contact.  She appeared oriented to time,

person and place.  Plaintiff claimed that she sometimes saw things in a room or in

the woods while driving, which were not there. There was no indication of recent

or remote memory impairment.  Plaintiff's mood and affect were appropriate.

There was no suggestion of impairment of insight or judgment.  Hand and finger

dexterity were intact.  Grip strength was 5/5 bilaterally.  Plaintiff was

right-handed. Her head was normocephalic and atraumatic. There was no tremor.

Plaintiff's neck was supple. Cranial nerves II-XII were normal and functional. The

fundi of the eyes were normal. There was no nystagmus. There was no left/right

field defect.  In the upper extremities, plaintiff exhibited strength of 4/5 in the

proximal muscles on the right side, and 5/5 on the left side. Strength in the distal

muscles was 5/5 on the right side, and 5/5 on the left side. Tr. 325.  There was no

dysmetria.  Deep tendon reflexes were physiologic and equal. Muscle tone was

normal.  Rapid alternating movements were normal. There was no muscle atrophy.

The lower extremities appeared antalgic on the right side.  The legs exhibited

strength of 4/5 on the right side in the proximal and distal muscles. On the left side

strength was 5/5 in the proximal muscles and 4/5 in the distal muscles. There was

no dysmetria.  Deep tendon reflexes were physiologic and equal.  Muscle tone was

normal.  Heel-to-shin testing was normal.  Babinski reflexes were negative. There

were no tremors. There was no muscle atrophy.  Sensation was diminished to

pinprick in the L5 distribution on the right side distally, in the S1 distribution of

the upper calf, to the metacarpophalangeal area on the left hand, and to the wrist

on the right hand. Tr. 326. To light touch, there was subjective decrease in the

right middle finger.  Proprioception was intact. Vibration could not be tested. The

diagnoses were neck pain with history of degenerative disc disease and radicular symptoms, history of uveitis, and history of depression.  Dr. Magurno stated that plaintiff should avoid overhead use of her arms. She had marked limitations for walking, standing, lifting, carrying, pushing and pulling on the right side. She had moderate limitations for reaching on the right side below the shoulder level. There were no observed limitations below the shoulder level for reaching, pushing, or pulling on the left side, fine motor activity, speech, hearing and sitting.  Tr. 326.

Dr. Magurno also performed a consultative orthopedic examination on August 24, 2009. Tr. 335-47.  Dr. Magurno found that plaintiff appeared to be in no acute distress. Tr. 337.  She could squat half way.  Her station was normal. Range of motion testing of the cervical spine revealed that flexion was 10 degrees, extension was full, lateral flexion was 20 degrees on the right side and 30 degrees on the left side. Tr. 338.  Plaintiff was tender on the low cervical spine, on the right paracervical muscles and the right trapezius muscle.  Trigger point testing revealed tenderness on the mid point. Plaintiff was tender above the scapular spine near the medial border of the scapula bilaterally, on the anterior neck, and on the left second costal chondral joint for a total of five trigger points positive.  Range of motion testing of the upper extremities revealed forward elevation of the right shoulder to 120 degrees and full forward elevation of the left shoulder. Tr. 338.

9

Abduction was to 140 degrees on the right side and full on the left side.

Adduction was full bilaterally. Internal rotation was 20 degrees to the right side

and 30 degrees to the left side. External rotation was full bilaterally. There was

tenderness on the right acromio-claviculart ("A/C") joint area and on the supra and

infraspinatus muscles.  Plaintiff had full range of motion of the elbows, forearms,

wrists and fingers bilaterally.  There was no joint inflammation, effusion, or

instability.  The thoracic and lumbar spines exhibited flexion to 70 degrees, full

extension, full lateral flexion, and full rotary movements.  There was tenderness on

the spine and paraspinal muscles in the upper lumbar area.  There was tenderness

on the right sciatic notch.  There was no spasm, scoliosis or kyphosis.  Straight leg

raising was 30 degrees on the right side and 60 degrees on the left side in the

supine position.  From the seated position, straight leg raising was 70 degrees on

the right side and 90 degrees on the left side.  Three trigger points were positive in

the upper outer quadrant of the gluten, posterior aspect of the greater trochanter

both on the right and the medial fat pad of the left knee. Tr. 338.  The lower

extremities showed that hip flexion was 90 degrees on the right side and full on

the left side. Tr. 339.  There was full range of motion on interior and exterior

rotation, adduction and abduction. There was full range of motion of the knees and

ankles bilaterally. The left lateral ankle appeared thickened. The diagnoses were

10

neck pain with history of degenerative disc disease and radicular symptoms; right

shoulder pain, status post fracture; status post rotator cuff surgery (right); history

of bilateral heel spurs and plantar fasciitis; history of neuroma, left foot; right hip

pain, history of arthritis; current history of urinary tract infection; and history of

depression.  Dr. Magurno repeated her previous statements, adding that there

would be mild limitations for bending, moderate limitations for squatting. Tr. 339.

In a medical source statement dated August 27, 2009 (Tr. 328-34, 341-47),

Dr. Magurno assessed that plaintiff could lift and carry up to ten pounds

occasionally. Tr. 328, 341.  Plaintiff could sit for four hours at a time and a total of

eight hours in an eight-hour day. Tr. 329, 342.  She could stand and walk for

fifteen minutes at a time and a total of one hour in an eight-hour day.  She could

not reach overhead. Tr. 330, 343.  She could finger and feel occasionally with both

hands.  She could push, pull and reach in other directions continuously with her

left hand and occasionally with her right hand.  She could use her feet occasionally

to operate foot controls.  She could climb ramps and stairs and stoop occasionally.

She could not climb ladders or scaffolds, balance, kneel, crouch or crawl. Tr. 321,

344.  She needed to avoid unprotected heights, moving mechanical part and

vibrations. She could occasionally operate a motor vehicle and tolerate exposure

to humidity, wetness and extreme cold and heat.  She could be exposed to dust,

11

odors, fumes and pulmonary irritants continuously. Tr. 332, 345.  She could not walk at a reasonable pace on rough or uneven surfaces.  However, she could shop, travel without a companion, use standard public transportation, climb a few steps, prepare a simple meal, care for her personal hygiene, and sort, handle and use paper files. Tr. 333, 346.

At the first administrative hearing held on September 27, 2006, plaintiff appeared and testified, inter alia, that she has a high school diploma. She explained that she last worked on May 18, 2004.  She stated that she was having a worsening of her neck and bilateral shoulder pain which had been developing over the past several months. The right side was worse than the left side.  She testified that she had difficulty performing her job duties as a hair dresser.  Plaintiff further testified that her pain is in the right side which radiates down both upper extremities as well as into her head. Her treatment regimen includes physical therapy, massage therapy, medications and treatments from her doctors. She was referred to the Center for Pain Relief, Vestal, New York, for a course of pain management. Tr. 240-43.

Plaintiff testified that she had a driver's license and she drove to the hearing. Tr. 391. She estimated that she drove an hour a week. Tr. 399. She went to church a couple of times a month.  She stated that she could walk one mile. Tr.

400.  She shopped with a companion. Tr. 399.  She further testified that her typical

day involves writing in her journal, watching T.V., and listening to books on tape.

Tr. 398.  She testified that she can lift no more than a gallon of milk and if she

attempts to lift more than a gallon of milk, she has to lie down in bed the entire

next day.  The housework, at that point in time, was done by her daughters. She

stated that she slept poorly and her sleep was affected by her pain.

   The second administrative hearing was held on September 10, 2009. Tr.

355.  Plaintiff testified that lived alone with a cat. Tr. 360. She said that she still

had a driver's license. Tr. 360.  She kept a journal and made jewelry. Tr. 363.

Plaintiff alleges that her testimony on that date demonstrated an extreme

decomposition of both her physical and mental state. Tr. 355-73.  With respect to

her alleged mental decomposition, plaintiff testified about having lost all hope and

at times, being concerned about being given sleeping pills due to what she might

do to herself.  She testified that she had a fear of doing something to herself that

she didn't want to do. Tr. 369. While she acknowledged that she has not had any

counseling by a mental health professional recently, she testified that a lack of

money prevented her from seeking counseling. Tr. 371.  She testified that the side

effects of Celexa, the anti-depressant she was prescribed, caused a lack of desire,

emotions and a feeling of numbness. Tr.373.  Alleging that she went to the

psychiatric unit at Binghamton General Hospital to talk to staff there, she testified that she left as she was afraid that they were going to "keep" her. Tr. 373.  Plaintiff was emotional and crying throughout the course of the hearing and her testimony. With respect to her physical problems, she testified that she was seriously limited in her ability to use a computer due to both her neck and upper extremity problems as well as a recently diagnosed eyesight issue known as uveitis. Tr. 366-68. Plaintiff claims that everything she sees through her left eye is blurry and foggy. Tr. 366.  She stated that she puts eye drops in her eye twice a day to dilate them. Tr. 367. However, if she uses the eye drops, she in unable to drive for that day. Tr. 367. She can look at a computer screen no more than five to ten minutes. Tr. 367. She has to wear sunglasses both outside and inside when it is bright light. Tr. 367. Additionally, her fingers and her arm fall asleep if she is typing on the keyboard for more than five to ten minutes. Tr. 368. The numbness goes from her fingertips up to her elbows. Tr. 368.

At that September 10, 2009 hearing, VE Esperanza DiStefano appeared and testified that plaintiff's former job as a cosmetologist was skilled, light work, finding that the only transferable skills are plaintiff's past history of booking appointments as a hairdresser. Tr. 375.  In the first hypothetical provided by the ALJ, he asked the VE to assume that a person of plaintiff's age, education and

14

experience could lift and carry twenty pounds occasionally, and ten pounds frequently, stand and walk six out of eight hours, and sit six out of eight hours. She could push and pull. She could not use the right upper extremity repetitively. Tr. 375.  She could occasionally climb, balance, stoop, kneel, crouch and crawl. Tr. 375-76.  The VE stated that the individual could not perform plaintiff's past relevant work, but could perform other light and sedentary jobs. Tr. 376-77.  The VE identified the unskilled, light jobs of messenger, ticket taker, and parking lot attendant. Tr. 376-77.  The VE also identified the sedentary jobs of information clerk, telephone solicitor, and order clerk. Tr. 377-78.  The VE testified that if the individual had to wear sunglasses in bright lights, the availability of these jobs would not be affected. Tr. 378.

In Hypothetical 2, the ALJ asked the VE to assume that a person of plaintiff's age, education and experience could lift and/or carry ten pounds occasionally and less than ten pounds frequently, sit for eight out of eight hours, for four hours at a time, and stand and/or walk for two hours out of eight hours and for fifteen minutes at a time. Tr. 378. She should not perform overhead reaching bilaterally, but occasionally could do other reaching, handling, pushing and pulling with the right hand. She could continuously finger and feel with the right hand. She could continuously perform these various operations with the left

hand. Tr. 379. She could occasionally use foot controls bilaterally, climb stairs and ramps, and stoop; but should not climb ladders or scaffolds, balance, kneel, crouch, or crawl. She should not work at unprotected heights or in the vicinity of mechanical moving parts or vibration, but could occasionally operate a motor vehicle and be exposed to humidity/wetness and temperature extremes. She had no limitations regarding exposure to dust, odors, fumes and pulmonary irritants. She could perform activities such as shopping, traveling without a companion for assistance, ambulating without an assistive device, using standard public transportation, climbing a few steps at a reasonable pace with the use of a single hand rail, preparing simple meals and feeding herself, caring for her personal hygiene, and sorting, handling, and using paper/files; but could not walk a block at a reasonable pace on rough or uneven surfaces. Tr. 379.  In response to Hypothetical 2, the VE testified that the individual would be able to perform the three previously identified sedentary jobs, also identifying the additional sedentary job of new accounts clerk. Tr. 379-80.  The third hypothetical presented by the ALJ contained a restriction for an individual who can use a computer for no more than fifteen 15 minutes at a time, and again, the VE found that the individual could perform the previously identified sedentary jobs.

**II.    Discussion**

16

Plaintiff submits that the Commissioner erred in finding no disability within the meaning of the Social Security Act; erred in failing to order a consultive psychological examination; improperly applied the treating physician rule; had no medical basis for his RFC finding; and failed to sustain his burden at step five of the sequential evaluation process.  The Commissioner argues that the decision of the Commissioner, that plaintiff was not disabled, is supported by substantial evidence and therefore must be affirmed.

### A.    Standard of Review

This court does not review a final decision of the Commissioner de novo, but instead "must determine whether the correct legal standards were applied and whether substantial evidence supports the decision."  Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004) (internal citations omitted).  See also Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004);  Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998).  "Substantial evidence" is evidence that amounts to "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Halloran, 362 F.3d at 31 (quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971)).  "An ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision."  Gravel v.

Barnhart, 360 F.Supp.2d 442, 444-45 (N.D.N.Y. 2005) (citing Ferraris v. Heckler,

728 F.2d 582, 587 (2d Cir. 1984)).   When reviewing a determination by the

Commissioner, a district court, in its discretion, "shall have the power to enter,

upon the pleadings and transcript of record, a judgment affirming, modifying, or

reversing the decision of the Commissioner of Social Security, with or without

remanding the cause for a rehearing."  42 U.S.C. § 405(g).

###### B.    Disability Defined

An individual is considered disabled for purposes of his or her eligibility for

Social Security Disability if he or she is unable to

> engage in any substantial gainful activity by reason of
> any medically determinable physical or mental
> impairment which can be expected to result in death or
> which has lasted or can be expected to last for a
> continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

The Commissioner may deem an individual applicant for Social Security

Disability to be disabled

> only if his physical or mental impairment or impairments
> are of such severity that he is not only unable to do his
> previous work but cannot, considering his age,
> education, and work experience, engage in any other
> kind of substantial gainful work which exists in the
> national economy, regardless of whether such work
> exists in the immediate area in which he lives, or whether

> a specific job vacancy exists for him, or whether he
> would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

Social Security Administration regulations set forth a five-step sequential evaluation process, by which the Commissioner is to determine whether an applicant for Social Security Disability is disabled pursuant to the aforementioned statutory definition.  See 20 C.F.R. § 404.1520.  The Second Circuit Court of Appeals summarizes this process as follows:

> The first step of this process requires the Secretary to determine whether the claimant is presently employed. If the claimant is not employed, the Secretary then determines whether the claimant has a "severe impairment" that limits [his] capacity to work. If the claimant has such an impairment, the Secretary next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the Secretary will find the claimant disabled. However, if the claimant does not have a listed impairment, the Secretary must determine, under the fourth step, whether the claimant possesses the residual functional capacity[1] to perform [his] past relevant work. Finally, if the claimant is unable to perform [his] past relevant work, the Secretary determines whether the claimant is capable of performing any other work. If the claimant satisfies [his] burden of proving the requirements in the first four steps,

---

[1]     Residual functional capacity ("RFC") refers to what a claimant can still do in a work setting despite any physical and/or mental limitations caused by his or her impairments and any related symptoms, such as pain.  An ALJ must assess the patient's RFC based on all the relevant evidence in the case record. See 20 C.F.R. § 404.1545 (a)(1).

> the burden then shifts to the Secretary to prove in the
> fifth step that the claimant is capable of working.

Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quoting Perez v. Chater, 77 F.3d
41, 46 (2d Cir. 1996)).

The fifth step "requires the [ALJ] to consider the so-called vocational
factors (the claimant's age, education, and past work experience), and to determine
whether the claimant is capable of performing other jobs existing in significant
numbers in the national economy." Quezada v. Barnhart, 2007 WL 1723615
(S.D.N.Y. 2007) (internal quotations omitted).

A person is deemed disabled if he or she is unable to engage in any
substantial gainful activity by reason of any medically determinable physical or
mental impairment which can be expected to result in death or which has lasted or
can be expected to last for a continuous period of not less than twelve months.
Substantial work activity is defined as "work activity that involves doing
significant physical or mental activities.  Your work may be substantial even if it
is done on a part-time basis or if you do less, get paid less, or have less
responsibility than when you worked before."  Gainful work activity is defined as
"work activity that you do for pay or profit.  Work activity is gainful if it is the
kind of work usually done for pay or profit, whether or not a profit is realized." 20
C.F.R. § 404.1572(a-b) (West 2009).

20

## C.     Analysis

In the case at bar, the ALJ applied the a five-step sequential evaluation

process and determined that plaintiff (1) meets the insured status requirement of

the Social Security Act through December 31, 2009; (2) has not engaged in

substantial gainful activity since May 18, 2004, the alleged onset date (20 CFR

404.1571 et seq. and 416.971 et seq.); (3) has the following severe impairments:

degenerative disc disease (20 CFR 404.1520(c) and 416.920(c))[2]; (4) does not

have an impairment or combination of impairments that meets or medically equals

one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR

404.1520(d), 404.1525, 404.1526, 416.920(d) and 416.926)).  At Step 5, the ALJ

held that, after careful consideration of the entire record, plaintiff could, inter alia,

lift or carry 10 pounds occasionally and less than ten pounds frequently; sit eight

hours out of an eight-hour day, four hours at a time; stand or walk two hours out of

an eight-hour day, fifteen minutes at a time; should not perform overhead

reaching, or work at unprotected heights or in the vicinity of moving parts, etc.

The ALJ also noted that plaintiff should use sunglasses in bright light.

Plaintiff first argues that the ALJ erred in not ordering a consultive

---

[2]     The ALJ also considered plaintiff's non-severe impairments of asthma, status-post right shoulder surgery, left heel pain, hypothyroidism, epicondylitis, eye difficulties, and depression. Tr. 25-28.

psychological examination, stating that the physician performing a physical consultive examination on behalf of the SSA "strongly recommended a psychological examination." Doc. No. 9, p. 12.  In fact, the physician, Dr. Magurno, stated "[p]sychology evaluation is suggested." Tr. 326.  The Commissioner argues that there was no need to obtain a consultive medical examination because the record contains adequate evidence concerning plaintiff's mental condition.  In addition, the Commissioner notes that plaintiff did not ask the ALJ to order a consultive mental examination, and in fact she was uncooperative in attending the consultive physical examinations that the ALJ ordered.  In addition, the Commissioner argues that the consultive neurological examination performed by Dr. Magurno on August 24, 2009 included a mental status examination, and there were also comments in the record from Dr. Boyle concerning plaintiff's mental condition.  The court notes that the record reveals plaintiff reported depression to Dr. Boyle as caused by life events such as her divorce, death of a family member, incarceration of a son, and breaking up with her boyfriend. Tr. 245, 259.  The ALJ found that plaintiff did not initially allege an inability to work based on depression, and despite receiving antidepressant medications and a referral to a mental health clinic from Dr. Boyle, the record does not indicate that plaintiff ever attended the clinic, nor did she adhere to taking the

antidepressant  medications on a regular basis. Tr. 26.  Accordingly, the court is

not persuaded by plaintiff's argument that the ALJ erred in not ordering a

consultive psychological evaluation.

Next, plaintiff argues that the ALJ improperly excluded certain diagnoses as

non-severe impairments.  Specifically, plaintiff indicates that plaintiff's diagnosis

of depression, and her right shoulder, post-2001 shoulder surgery, were severe

impairments.  The court found, supra, that substantial evidence supports the ALJ's

finding on plaintiff's depression/mental status.  The court notes that the ALJ

considered plaintiff's shoulder, and noted that plaintiff was able to work as a

cosmetologist for years subsequent to that surgery, and plaintiff's May 2004 right

shoulder X-rays were negative. Tr. 25.  The court finds the plaintiff's argument

unavailing.

The plaintiff next argues that the ALJ had no medical basis for its RFC

finding, which the court construes as an argument that the ALJ did not adhere to

the treating physician rule.  Plaintiff argues that although the ALJ referenced three

RFC findings when questioning the VE, none of the three RFCs are fully

consistent with the findings of plaintiff's treating physician Dr. Boyle.  The

Commissioner argues that the ALJ considered the opinions of plaintiff's treating

sources, and will afford controlling weight to a treating physician's opinion on the

23

issues of the nature and severity of a claimant's impairment only if the opinion is well supported by medically acceptable clinical and diagnostic techniques and is not inconsistent with other substantial evidence of record, citing 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2).  The ALJ indicated that he gave Dr. Boyle's assessments limited weight because her statements contained the words "pt states" and "patient's statements," indicating that Dr. Boyle's assessments were based on plaintiff's subjective reports of limitations, rather than on objective evidence.  In addition, Dr. Boyle's RFC assessments did not provide an estimate of the amount of time plaintiff could sit, stand or walk.  However, the Commissioner states that the ALJ's findings were essentially consistent with Dr. Boyle's statements concerning these abilities. Doc. 12, p. 21.  The court finds that the ALJ did not err in considering and giving more weight to Dr. Magurno's comprehensive, thorough and detailed assessment of plaintiff's condition, which the ALJ then used to determine plaintiff's RFC and to form his hypothetical questions to the VE.

Finally, plaintiff argues that the SSA failed to sustain its burden at Step 5 of the sequential evaluation process by reliance on the testimony of a VE, when the VE is allegedly presented with improper hypothetical questions.  Plaintiff submits that the VE's testimony regarding plaintiff's ability to perform alternative employment in the national and regional economy should not be considered by the

court.  As stated <u>supra</u>, the court does not find that the ALJ's hypothetical questions were flawed.  The Commissioner argues, and the court concurs, that the ALJ used the medical vocational guidelines as a framework and used the VE and plaintiff's own testimony to conclude that plaintiff would be able to perform a significant number of jobs in the national economy.  The court also notes that when plaintiff was denied disability benefits after the first administrative hearing, plaintiff told Dr. Boyle on February 8, 2007, and again on December 11, 2008, that she was looking for a job, and "hoping to get one soon." Tr. 306; 319.  After a thorough review of the information set forth in the administrative record, the court finds that the ALJ properly determined that plaintiff was not under a disability within the meaning of the Social Security Act.

## III.    Conclusion

Accordingly, for the reasons set forth above, plaintiff's motion for judgment on the pleadings (Doc. No. 9) is DENIED, and the Commissioner's motion for judgment on the pleadings (Doc. No. 12) is hereby GRANTED.  The Clerk is instructed to close this case.

SO ORDERED.

May 23, 2012

Neal P. McCurn
Senior  U.S. District Judge

25